UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOHN MILLS,<br><br>        Plaintiff,<br><br>v.<br><br>INTERMOUNTAIN GAS COMPANY, an Idaho corporation; MDU RESOURCES GROUP, INC., a publicly traded company; and UNITED ASSOCATION OF JOURNEYMEN AND APPRENTICES OF THE PLUMBING & PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA, LOCAL 296 OF BOISE, a union,<br><br>        Defendants. | Case No. 1:10-cv-00290-EJL-CWD<br><br>**REPORT AND RECOMMENDATION** |

## REPORT

## INTRODUCTION

Plaintiff John Mills, a former employee of Defendant Intermountain Gas

Company, claims he was discharged from his employment without "just cause" and that

his union, the United Association of Journeymen and Apprentices of the Plumbing &

Pipefitting Industry of the United States and Canada, Local 296 of Boise, failed to fairly

represent him when it decided not to grieve his discharge.[1] Mills' claim is a hybrid Section 301 action arising under the Labor Management Relations Act, 29 U.S.C. §§ 141–187.[2] Defendants Intermountain Gas and the Union filed motions for partial summary judgment on Mills' Section 301 claim, contending there are no genuine issues of material fact as to Intermountain Gas's decision to terminate Mills' employment, and that the Union fairly represented him.

The Court conducted a hearing on January 26, 2012, at which the parties presented oral argument. After carefully considering the parties' arguments, the relevant authorities, and the evidence submitted, the Court makes the following recommendation to grant the motions for partial summary judgment.

# FACTS

The parties submitted copious amounts of material in support of and in opposition to the motions for partial summary judgment. What is set forth here, however, are what the Court has determined to be the undisputed, material facts for purposes of ruling on the pending motions.

---

[1] Plaintiff John Mills will be referred to herein as "Mills." Defendant Intermountain Gas Company is a wholly owned subsidiary of Defendant MDU Resources Group, Inc., (*see* Am. Compl. ¶ 3–4, Dkt. 39), and thus the reference herein to "Intermountain Gas" is intended to encompass both Defendant Intermountain Gas, Inc. and Defendant MDU Resources Group, Inc. The United Association of Journeymen and Apprentices will be referred to as "the Union."

[2] Mills brings two additional claims for violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et. seq.* and the Idaho Wage Claim Act, Idaho Code §§ 45-601 *et. seq.* for unpaid regular and overtime wages. However, the Defendants' motions for summary judgment are limited to Mills' claim under the LMRA, as the parties agreed to limit discovery and dispositive motions at this time to Defendants' liability under Mills' hybrid Section 301 claim. (Pl. Mem. at 2, Dkt. 55.) Therefore, this Report and Recommendation addresses only the LMRA claim.

## 1. Intermountain Gas

Intermountain Gas terminated Mills' employment on December 10, 2009, following a minor vehicle accident that occurred on November 23, 2009. After the vehicle accident, Mills returned to regular duty and worked without incident over the course of the next ten days until he was informed he was being suspended without pay on December 3, 2009, so Intermountain Gas could investigate the accident. (Decl. of Birch Ex. R, Pl.'s Response to Discovery, Dkt. 57-18 at 4.)

Intermountain Gas's reasons for terminating Mills' employment are set forth in a letter dated December 10, 2009, addressed to Mills, and a draft termination letter that was not provided to Mills. (Pl.'s Stmt. of Facts ¶ 19, Dkt. 56.)[3] The letter explained that Intermountain Gas was terminating Mills' employment for his "overall safety and performance record." The termination letter provides the following summary of Mills' "overall inability to perform [his] job safely and effectively:"

> History of vehicle accidents:
> 05/30/00 – Preventable
> 12/28/00 – Preventable
> 07/30/02 – Preventable
> 08/19/02 – Preventable
> 07/21/03 – Non preventable
> 01/07/04 – Non preventable
> 08/10/04 – Preventable
> • Verbal discussion, 10/14/04 for misrepresentation of OT reporting.
> • Letter of Reprimand, 09/03/04, violation of IGC procedures Vehicle Safety, Standard of Conduct and Use of Company Owned Vehicles.
> • Verbal discussion, 07/20/05 for misrepresentation of OT reporting.

---

[3] Intermountain Gas relies primarily upon its December 10, 2009 letter of termination to support its motion. (Intermountain Gas Stmt. of Facts ¶ 10, Dkt. 41; Pl.'s Mem. at 5, Dkt. 55.) Although there were other disciplinary actions noted in Mills' personnel file, the Court finds that they are not material to the determination of the motions for summary judgment, as the December 10, 2009 letter was the only document provided to Mills and used to support Intermountain Gas's decision to terminate Mills' employment.

• Verbal warning, 06/15/06 for misrepresentation on time sheet recording.
• Letter of Reprimand, 07/17/2006, for violation of IGC procedures Use of Company Owned vehicles and Standard of Conduct.
• Written warning 08/21/09 for violation of Company Policy 112, Standard of Conduct.…
• Verbal discussion 09/22/09, for emergency documentation and time reporting.
• Preventable vehicle accident on 11/23/09, violation of section C and F of IGC procedure Standard of Conduct and Corporate Safety.

(Decl. of Birch Ex. M, Dkt. 57 –13.)[4]

Mills' employment record spanned over nine years, beginning on February 1, 2000, when Mills started employment as a service technician in Hailey, Idaho. An Intermountain Gas service technician is responsible for the "day-to-day operations of ICG gas meters, customer usage, and most importantly, responding to emergencies." (Pl. Stmt. of Facts ¶7, Dkt. 56.) Mills worked in Hailey, Idaho, until he transferred to Boise in the fall of 2003, where he continued to work as a service technician. At the time of his termination from employment, Mills was a member of the Union. Intermountain Gas and the Union are subject to a collective bargaining agreement ("CBA"), which governs relations between Intermountain Gas and the Union's members. (Intermountain Gas Stmt. of Facts ¶ 1, Dkt. 41.)

The CBA between Intermountain Gas and the Union provides that Intermountain Gas "retains the right to discharge any employee for just cause," and will inform the employee of the reasons for discharge. (Aff. of Murray Ex. A, Dkt. 46 at 15.) If an

---

[4] Mills contends that Intermountain Gas considered other disciplinary actions contained in his personnel file, including a charge of sexual harassment that occurred in 2003. While Intermountain Gas may have considered those events, the termination letter provided to Mills did not identify anything other than the listed transgressions in support of the company's decision to discharge Mills. Therefore, the Court finds that the facts regarding disciplinary actions other than those listed in the December 10, 2009 termination letter are not material.

employee has five or more years of service with Intermountain Gas, a request for termination "must be approved by the President." (*Id.*) The decision to discharge Mills was recommended by management personnel to Tim Clark, who in 2009 was the vice-president of regions at Intermountain Gas. (Intermountain Gas Stmt. of Facts ¶ 9, Dkt. 41.) No one involved in the termination decision expressed any reservation or disagreement with the decision to terminate Mills' employment to Ms. Linda Murray, the human resources director. (*Id.*, Aff. of McGee, Murray Depo. at 89, Dkt. 48 at 45).

As documented in the termination letter, Mills' vehicle accident history was primarily concentrated in the early years of his employment, and six of the eight accidents were characterized as preventable. According to Intermountain Gas records, the details of Mills' preventable accident history are as follows: (1) rear-end collision on May 30, 2000; (2) minor collision on December 28, 2000; (3) accident involving backing over a newspaper box on July 30, 2002; (4) accident involving backing into a parked vehicle on August 19, 2002; (5) accident involving failure to yield on August 10, 2004; and (6) final accident precipitating Mills' discharge, which involved backing into a parked car on November 23, 2009.[5]

Mills received a letter of reprimand on September 3, 2004, as a result of the vehicle accident on August 10, 2004. (Aff. of Murray Ex. L, Dkt. 46 at 72.) The letter was issued because of Mills' prior vehicle accident history, and quoted Intermountain Gas's safety policy, which states, in part, that "all drivers of Company vehicles are

---

[5] Mills's other two accidents were not preventable, and determined to be caused by third parties. (Intermountain Gas Stmt. of Facts ¶ 12, Dkt. 41.)

expected to observe the rights of pedestrians and other drivers, observe the ordinary rules of courtesy and restraint in driving and operate the vehicles in a safe manner." The letter concluded with the following statement: "Vehicle safety is very important to the Company therefore any accidents in the future or failure to comply with all local vehicle laws and Company vehicle procedures and standards of conduct may result in reprimand, suspension, or termination of employment." (Aff. of Murray Ex. L, Dkt. 46 at 72.)

Mills received no other vehicle related reprimands until July 17, 2006, when he was issued a letter of reprimand after Intermountain Gas's Safety Committee conducted a routine seat belt check on all employees that drove a company vehicle to work. The Committee found Mills was not wearing his seat belt, in violation of company safety policy prohibiting employees from "operation of the vehicle in an unsafe manner." (Aff. of Murray Ex. N, Dkt. 46 at 76; Decl. of Mills ¶ 7, Dkt. 59.) The July 17, 2006 letter concluded with the same warning as the prior reprimand letter that failure to comply with vehicle laws and company vehicle procedures "may result in further disciplinary action up to and including termination of employment." (*Id.*) Mills had no other vehicle accidents from August 10, 2004, up until the November 23, 2009 accident, which precipitated Mills' termination from employment. (Decl. of Mills ¶5, Dkt. 59.) Just prior to his November 2009 accident, Mills had watched a video on or about October 21, 2009, entitled "Distracted Driving At What Cost?" for an Intermountain Gas course regarding safe vehicle operation. (Aff. of Murray Ex. O at 13, Dkt. 46 at 90.)

The accident on November 23, 2009, that precipitated Mills' discharge occurred when Mills was backing out of his driveway after his lunch break had ended, and he hit a

parked car on the opposite side of the road directly across from the driveway. (Aff. of Mills ¶ 5, Dkt. 49 at 2; Aff. of McGee, Mills Depo. at 102, Dkt. 48 at 9.) Mills knew there was a blind spot behind his truck that was not visible in his rear view or side mirrors. (Aff. of McGee, Mills Depo. at 101, Dkt. 48 at 9.) Before he backed up, Mills did not get out of his truck and observe what was around him, because he was familiar with the neighborhood. (*Id.*, Mills Depo. at 106, Dkt. 48 at 10.) Although no citation was issued, law enforcement filled out a report for the owner of the car, and noted that the cause of the accident was inattentiveness and improper backing attributable to Mills. (Mills Depo. at 106 –7, Dkt. 48 at 10.)

Pursuant to the CBA, Intermountain Gas has the authority to require its employees to adhere to its workplace policies. (Aff. of Murray Ex. O, Art. 4, Dkt. 46 at 11.) Intermountain Gas's Vehicle Safety Guidelines state, in full, that employees are subject to disciplinary action for the following vehicle infractions:

1. Failure to keep assigned Company vehicle in good operating condition.
2. Failure to keep assigned Company vehicle clean.
3. Two (2) or more vehicle accidents in 3 years which were determined to be preventable.
4. Two (2) or more citations in a Company vehicle within 3 years.
5. One (1) or more citation and one (1) or more preventable accidents in 3 years.
6. Any CDL driver, whose job requires a CDL, who violates D.O.T. guidelines and has CDL license suspended as a result.
7. Preventable accident due to negligence and/or reckless driving.
8. Damage to company vehicle due to negligence and/or recklessness.
9. Loss of valid operator's license.
10. Loss of insurability as a driver.
11. Failure to report an accident.
12. Reckless driving and/or road rage.

Appropriate disciplinary action shall be based on the:

1. Type of infraction
2. Frequency of the infraction
3. Results of the Infraction.
4. Employee safety record.

The level of disciplinary action may include:

1. Verbal warning from employee's manager.
2. Letter of Reprimand in personnel file.
3. Time off without pay depending on severity.
4. Termination of Employment.

(Aff. of Murray Ex. B(2), Dkt. 46 at 43; Decl. of Birch Ex. P, Dkt. No. 57-16 at 3.)

In addition to the vehicle related infractions, the termination letter described several other instances of discipline. There were three occasions where supervisors had verbally discussed or warned Mills about timekeeping and overtime reporting requirements. On October 14, 2004, a supervisor discussed with Mills that he was not to work through lunch and claim overtime. (Aff. of Murray Ex. P, Dkt. 46 at 93.) Mills did not sign this document, and it was handwritten. On July 20, 2005, a supervisor spoke with Mills concerning overtime reporting during lunch hours, and Mills was cautioned not to work through lunch if not necessary. (Aff. of Murray Ex. Q, Dkt. 46 at 95.) Mills was not aware at the time of the discussion that the July 20, 2005 record was later placed in his personnel file. (Decl. of Mills ¶ 8, Dkt. 59.) And on June 15, 2006, a record of verbal warning, later changed to a discussion, was lodged in Mills' file concerning his timekeeping, excessive break time, and overtime reporting. (Aff. of Murray Ex. R, Dkt.

46 at 97–98.)[6] The June 15, 2006, write up was changed from a "warning" to a "discussion" because Mills disclosed extenuating personal circumstances necessitating longer than usual breaks. (Decl. of Mills ¶ 6, Dkt. 59.) Mills signed the June 15, 2006 record of verbal discussion.

On August 21, 2009, Supervisors Randy Morgan and Andy Schneider prepared a written warning after a discussion with Mills for various irregularities in record keeping by reporting orders out of sequence, incident response, time reporting, and mobile data collection. (Aff. of McGee ¶ 2, Ex. A, Dkt. 48 at 17.) The events giving rise to the August 2009 written warning occurred over the course of a single day, on July 24, 2009. According to Mills, part of the problem that day concerned his mobile data system going "off-line," and Intermountain Gas dispatch knew he had to leave work by 5:00 p.m., which necessitated working through his scheduled breaks. (Pl.'s Stmt. of Facts ¶ 30, Dkt. 56 at 8–9.) Mills believed he was correctly reporting his overtime hours worked on July 24, 2009, (*Id.* at ¶ 31), and Mr. Morgan confirmed that the mobile system did occasionally go off-line and that service technicians were allowed to take orders out of sequence (*Id.* at 34.)

However, on July 28, 2009, prior to preparing the written warning, Morgan discussed the events that occurred on July 24 with Mills, and had conducted an investigation concerning Mills' contention that his mobile device went "off-line." (Aff. of Morgan Ex. A, Dkt. 50.) No evidence of any irregularity with Mills' electronic

---

[6] Exhibit R is titled "Record of Verbal Warning," and underneath is written "Discussion." Mills understood this instance to be a discussion, considering his personal family circumstances necessitated time away from work.

equipment was found. Mills signed the written warning without providing any further explanation refuting the statements in the written warning. The warning expressly stated that "any other future violations of policies and procedures may result in further disciplinary action up to and including termination of employment." (Aff. of McGee ¶ 2, Ex. A, Dkt. 48 at 18.)

A more recent disciplinary discussion occurred on September 22, 2009, which supervisor Randy Morgan documented by a hand written note on what appears to be a company time sheet record. The discussion concerned the proper reporting of overtime, routing orders with optimal route and driving instructions, and lunch breaks. (Aff. of Morgan Ex. B, Dkt. 50 at 9.) Mills, however, was unaware that the conversation, which Mr. Morgan viewed more as a "coaching session," was documented and placed in his personnel file, and the handwritten note was not signed by Mills. (Pl.'s Stmt. of Facts ¶ 28, Dkt. 56 at 8.) Intermountain Gas policy dictates that nothing is to be placed in an employee's personnel file without the knowledge and/or signature of the employee. (Decl. of Birch Ex. Q, Dkt. 57-17.)

Each year for the five years prior to his termination from employment, Mills received multiple, positive performance reviews. (Pl.'s Stmt. of Facts ¶ 11, Dkt. 56.) His most recent performance rating on August 31, 2009, indicated his overall performance was "satisfactory," and that Mills was a "competent, dependable and consistent performer" when it came to performing the important function of his job. (Pl.'s Stmt. of Facts ¶¶ 6—17, 13, 20, 28—29, Dkt. 56.) In addition, the August 2009 performance evaluation commended Mills for his response to numerous emergencies "during the past

12 months," and his compliance "with other company and departmental guidelines and policies regarding safety and training requirements." (Pl.'s Stmt. of Facts ¶ 9, Ex. F, Dkt. 56.) Mills' August 31, 2009 performance review referenced the recent August 21, 2009 written warning by noting that areas for improvement "were communicated to [Mills] recently, and [Mills] agreed to improve along those lines as was discussed." (Decl. of Birch Ex. F, Dkt. 57-6.) The review noted that the pattern of behavior resulting in the recent warning letter was "not new" and was noted on performance reviews in 2004, 2005, and 2006.

Intermountain Gas is supportive of its employees, and generally follows a progressive discipline policy. (Depo. of Morgan at 16, Dkt. 57-2 at 5.) Although some circumstances would not warrant progressive discipline, generally employees would receive progressive steps of discipline, such as beginning with a verbal warning, moving to a written warning, and then a suspension, before termination of employment. (Depo. of Murray at 15, Dkt. 57-3 at 4.)

**2.      The Union Investigation**

Upon Mills' termination, Rod Clay, the Union representative, undertook an investigation. The Union's statement of facts primarily relies upon Clay's declaration, which Mills contends is inaccurate and contrasts with Clay's deposition testimony. Accordingly, the Court has reviewed Clay's deposition testimony, and finds the following facts regarding Clay's investigation to be material and undisputed.

Clay first met with Mills on December 3, 2009. (Decl. of Strindberg, Ex. B, Depo. of Clay at 53, Dkt. 62-2 at 9.) At that meeting, Mills brought with him the written

warning from August 21, 2009, and Clay asked Mills for his side of the story. (Depo. of Clay at 54, Dkt. 62-2 at 9.) Clay asked Mills if the August 2009 written warning was the only thing in Mills work record, and Mills "told [Clay] that this was the only thing in his work record." (Depo. of Clay at 56, Dkt. 62-2 at 9.) At the time Mills described the events of July 24, 2009, that led to the write up of August 21, 2009, Mills' version sounded reasonable to Clay, and he had no reason to doubt what Mills told him about what had occurred on July 24, 2009. (Depo. of Clay at 58, Dkt. 62-2 at 10.) Clay recalls also that Mills described the November 23, 2009, vehicle accident to him, and was told that it was minor and that it was not Mills' fault. (Depo. of Clay at 59, 61, Dkt. 62-2 at 10-11.)

On December 10, 2009, Clay accompanied Mills to the offices of Intermountain Gas for a meeting, during which the termination letter was read to Mills. (Depo. of Clay at 66 –67, Dkt. 62-2 at 12.) During the meeting, Clay questioned why Mills' prior accidents were being considered, and at the meeting's conclusion, Clay requested a copy of the termination slip and evidence relied upon from Intermountain Gas. (Depo. of Clay at 68 –72, Dkt. 62-2 at 12 –13.)[7] Linda Murray, the Human Resource manager for Intermountain Gas, indicated she would gather the information for Clay. (Depo. of Clay

---

[7] Mills attempts to characterize Clay as saying "nothing" during the meeting, and that he "just sat there." (Pl.'s Stmt. of Facts at 6, Dkt. 61 at 6.) Plaintiff mischaracterizes Clay's testimony. Clay's comment that he "didn't say nothing at that time" was apparently stated in the context of a question about Mills' August 21 write up. Plaintiff's counsel asked Clay whether Clay told Intermountain Gas management that he "had already looked at the --- the 8/21 write-up and had discussed it with John and that you didn't think it was valid," to which Clay responded "I didn't say nothing at that time. I figured when Linda came over ---Mark Van Slyke was not who I usually deal with, so I wasn't going to deal with him." (Depo. of Clay at 72, Dkt. 62-2 at 13.)

at 73, (Dkt. 62-2 at 14.) Also, Clay scheduled a meeting with Murray to occur the day after the termination meeting.

On December 11, 2009, Clay met with Linda Murray and Mark Van Slyke of Intermountain Gas, as well as Robert Peterson, Tom Larson, and Scott Horton to discuss Mills' termination. (Depo. of Clay at 81-83, Dkt. 62-2 at 16; Ex. I, Dkt. 62-9.) Tom Larson was the Union steward, and Scott Horton was the training coordinator and president of the Union at the time. (*Id.*). At the meeting, Clay inquired about Intermountain Gas's reasons for terminating Mills' employment, and he understood that the vehicle accident in November of 2009 was "not just the only thing he was terminated for, it was multiple incidences other than this and there were other write-ups and other things done." (Depo. of Clay at 83, Dkt. 62-2 at 16.) Clay documented the company's position that Mills "put himself to risk –not being ready for jobs. . . put customers at risk for not following all procedures." (Ex. I, Dkt. 62-9.) This note was in reference to Mills asking Intermountain Gas dispatch if someone else could be called for a service call while he was having lunch with his wife. (Depo. of Clay at 85, Dkt. 62-2 at 17.)

At the conclusion of the meeting, Clay called Tom Larson and Dave Call, both Union representatives, to "check into things," and Clay scheduled a meeting on December 16, 2009, with Mills, Mrs. Mills, and Scott Horton. (Ex. I, Dkt. 62-9.) At the December 16, 2009 meeting, Clay went through the Intermountain Gas records with Mills and allowed Mills an opportunity to tell his version of events. (Ex. I, Dkt. 62-9.) Tom Larson and Dave Call gathered information informally for Clay about other service technicians involved in vehicle accidents or with disciplinary action. On December 18,

2009, Clay and Larson discussed the results of Larson's investigation concerning the number of write ups and vehicle accidents service technicians had while working for Intermountain Gas. (Ex. I, Dkt. 62-9.) Clay talked also with a former Union steward, as well as a veteran service technician, and another floater service technician to understand how Mills was expected to perform his job. (Ex. I, Dkt. 62-9.)

On December 21, 2009, Clay again spoke with Tom Larson, and came to the conclusion that "John Mills record was excessive compared with most everybody." (Ex. I, Dkt. 62-9.) On December 22, 2009, Clay again spoke with Mills. (Ex. I Dkt. 62-9.) During the conversation with Mills, Clay explained that he would not be filing a grievance. Clay had determined that there was "enough to terminate John [Mills]," and provided a letter stating his decision and the reasons in support. (*Id.*)

## ANALYSIS

### 1 . Summary Judgment Standard

One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id.* at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

The evidence must be viewed in the light most favorable to the non-moving party, *id.* at 255, and the Court must not make credibility findings. *Id*. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The Court must be "guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255. If a claim requires clear and convincing evidence, the issue on summary judgment is whether a reasonable jury could conclude that clear and convincing evidence supports the claim. *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in his favor. *Id.* at 256-57. The non-moving party must go beyond the pleadings and show "by [his] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine issue of material fact exists. Celotex, 477 U.S. at 324. The Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified*

*Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir.2001) (quoting *Forsberg v. Pac. Northwest Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988)). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *So. Cal.Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003). Only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of America*, 285 F.3d 764, 773 (9th Cir.2002); *see also* Fed. R. Civ. P. 56(c).

2. **Claims for Discharge in Breach of Contract Against Intermountain Gas and Breach of Fair Representation Against the Union**

Mills alleges that Intermountain Gas terminated his employment in breach of the collective bargaining agreement between Intermountain Gas and the Union. Mills alleges also that the Union breached its duty of fair representation. Where a plaintiff claims his discharge was in breach of his employment contract under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and also claims the union breached its duty of fair representation which is implied under the National Labor Relations Act, the two claims are inextricably linked; a plaintiff must prove both in order to prevail. *See DelCostello v. Internat'l B'hd of Teamsters*, 462 U.S. 151, 164 –65 (1983); *see also Slevira v. Western Sugar Co.*, 200 F.3d 1218, 1222 (9th Cir. 2000). The Sixth Circuit has explained the linkage succinctly:

> If the union member fails to prove that the union breached its duty, he will, obviously, recover nothing from the union. If the union member fails to prove that the employer breached the collective bargaining agreement, he also will recover nothing, because the union member's grievance would have failed regardless of the union's representation.

*Vencl v. Internat'l Union of Operating Engineers, Local 18*, 137 F.3d 420, 424 (6th Cir. 1998). The Court need not consider the questions in any particular order. *Bliesner v. Communication Workers of Am.*, 464 F.3d 910, 914 (9th Cir. 2006).

### A. *Just Cause for Termination*

The substantive law in a Section 301 suit for breach of a CBA is federal common law. *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 456 –457 (1957); *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1242 (7th Cir. 1997). Under the terms of Article II, Section I of the CBA, Intermountain Gas could terminate Mills' employment if it had "just cause" to do so. Although the CBA does not explicitly define "just cause," disputes over the interpretation of the phrase are resolvable by summary judgment when there is no genuine dispute as to any material facts. *S.J. Groves & Sons Co. v. Internat'l Brotherhood of Teamsters*, 581 F.2d 1241, 1244 (7th Cir. 1978); *Power v. Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.*, 87 F.Supp.2d 545, 555 (E.D. Va. 2000) ("Whether the undisputed facts of a particular case establish just cause is a question of law for the court.") Courts have recognized that "just cause" is a "flexible concept, embodying notions of equity and fairness, and is certainly open to interpretation" by the Court. *Arch of Illinois, Div. of Apogee Coal Corp. v. District 12, United Mine Workers of Am.*, 85 F.3d 1289, 1294 (7th Cir. 1996). "Just cause" is the embodiment of what is "fair and reasonable, when all of the applicable facts and circumstances are considered." *Power*, 87 F.Supp.2d at 555. The penalty imposed must be in keeping with the seriousness of the offense. *Groves*, 581 F.2d at 1244 –45.

Mills argues that the applicable test enumerated above, and applied in *Crider* for

"just cause" under section 301 of the LMRA, lacks specificity and should be embellished

by the "Daugherty test," which sets forth seven factors to examine in determining "just

cause." (Pl.'s Mem . at 4 –5, Dkt. 55.) The Daugherty test was developed by an arbitrator

in 1972, and has been widely used and relied upon in arbitration proceedings.[8] *Conoco,*

*Inc., v. Oil, Chemical & Atomic Workers Intern. Union*, 26 F. Supp. 2d 1310, 1313 –14

(N.D. Okla. 1998). The Court declines, however, to adopt the Daugherty test, given this

Court recognizes that a "suit for breach of a collective bargaining agreement is governed

exclusively by federal law under section 301" of the LMRA. *Hoss v. United Parcel Serv.,*

*Inc.*, No. CV08-498-N-BLW, 2010 WL 985733 *3 (D. Idaho March 12, 2010) (quoting

*Young v. Anthony's Fish Grottos, Inc.*, 830 F.2d 993, 997 (9th Cir. 1987)). *See also Scott*

*v. The Riley Co.*, 645 F.2d 565, 568 n.4 (7th Cir. 1981) (rejecting the plaintiff's attempt to

have the Court adopt the criteria for finding "just cause" set forth in arbitration

decisions); Ninth Cir. Manual of Model Jury Instructions § 13.1 (2007 ed.) (defining "just

---

[8]  The seven factor test asks the following questions:
>    1. Did the company give to the employee forewarning or foreknowledge of the possible or probable disciplinary consequences of the employee's conduct?
>    2. Was the company's rule or managerial order reasonably related to (a) the orderly, efficient, and safe operation of the company's business and (b) the performance that the company might properly expect of the employee?
>    3. Did the company, before administering discipline to an employee, make an effort to discover whether the employee did in fact violate or disobey a rule or order of management?
>    4. Was the company's investigation conducted fairly and objectively?
>    5. At the investigation, did the 'judge' obtain substantial evidence or proof that the employee was guilty as charged?
>    6. Has the company applied its rules, orders, and penalties even-handedly and without discrimination to all employees?
>    7. Was the degree of discipline administered by the company in a particular case reasonably related to (a) the seriousness of the employee's proven offense and (b) the record of the employer in his service with the company?

*Am. Federation of State, County and Mun. Emp. Dist. Council 88, AFL-CIO, v. City of Reading*, 568 A.2d 1352, 1356 n.3 (Pa. 1990). A "no" answer to any of the seven questions normally would signify that just cause did not exist. *Id.*

cause"). Moreover, in all of the cases Mills cited in support of applying the Daugherty test, the court reviewed the merits of an arbitrator's decision, and recognized that upon review, it played a "very limited role." *See Conoco, Inc.*, 26 F.Supp.2d at 1315 (explaining the limited role a court plays upon review of an arbitrator's award). Therefore, the cases cited by Mills upholding the application of the Daugherty test are not applicable when the Court is asked in the first instance to examine the undisputed facts and determine upon motion for summary judgment if an employer had just cause to terminate an employment relationship under a CBA.

Turning to the facts of this case, the Court concludes that, taking the facts in a light most favorable to Mills, only certain disciplinary matters are material. First, while Intermountain Gas may have conducted an investigation into Mills' entire employment history, the reasons expressed in the December 10, 2009, termination letter were provided to Mills as justification for his termination from employment. Whittling down the facts further, Intermountain Gas policy dictated that nothing was to be placed in an employee's personnel file without the knowledge or signature of the employee, or both. Accordingly, the material facts include the disciplinary write ups that Mills was aware had been placed in his personnel file, which include Mills' vehicle accident history, the September 3, 2004 written warning, the June 15, 2006 discussion, the July 17, 2006 written warning, the August 21, 2009 written warning, and the November 23, 2009 accident. As discussed above, Mills does not dispute that those events occurred or were documented in his personnel file.

Although a close call, application of the principles of "just cause" compel the conclusion that there are triable issues of fact when considering whether Intermountain Gas's decision was fair and reasonable under the circumstances. Mills was a long term employee of Intermountain Gas for over nine years. During the first five years of his career, it is undeniable that Mills was involved in several vehicle accidents, the majority of which were preventable, and which culminated in a written warning on September 3, 2004. After that warning, Mills was accident free until November 23, 2009, a period of over five years, with only one other vehicle related safety violation for not wearing his seatbelt on July 17, 2006, more than three years prior to the November 2009 accident.

Mills' most recent employment review in August of 2009 praised him for following all policies regarding safety and training requirements. Although the recent August 21, 2009, warning was mentioned in the employment review as part of a "pattern of behavior," the pattern had lain dormant since 2006, when Mills had received his last verbal warning regarding his response to emergency situations. The employment review indicates that Mills' work would be periodically reviewed in the future, but there is no mention that Mills' continued employment was in jeopardy, or that one more policy related infraction would result in Mills' termination from employment. On the contrary, the employment review indicates that management would address with Mills "any and all discrepancies… as quickly as possible to correct performance issues, eliminate future misunderstandings and address any lack of training."

The accident that occurred on November 23, 2009, was indubitably minor, but preventable had Mills checked behind his truck before backing out of his driveway. Mills

admitted he did not check the vehicle's blind spot. Mills suggests, however, that the vehicle safety policy limits Intermountain Gas from imposing discipline unless an employee has two or more preventable vehicle accidents within three years. The Court disagrees, considering Intermountain Gas could impose discipline for any "preventable accident due to negligence and/or reckless driving." Nothing within the vehicle safety policy limits Intermountain Gas from imposing discipline for only serious accidents, or certain types of preventable accidents. Conceivably, any preventable accident, no matter how minor, could affect the company and its perceived role for being safety conscious considering its employees worked with flammable gas materials.

Nevertheless, while Intermountain Gas may have had the authority under its vehicle safety policy to impose discipline, the Court finds the facts disputed regarding whether Intermountain Gas followed its own progressive discipline policy under the facts of this case. In other words, the facts are disputed concerning Intermountain Gas's "just cause" to impose the harshest form of discipline, termination of employment, under the facts. After the vehicle accident, Mills returned to regular duty and worked without incident over the course of the next ten days until he was informed he was being suspended without pay on December 3, 2009, so Intermountain Gas could investigate the accident. The vehicle accident therefore precipitated Intermountain Gas's investigation not just into the accident and its cause, but into Mills' entire employment background.

However, the vehicle safety policy appears to limit discipline considerations to the employee's overall safety record as it relates to vehicle related infractions, not to other safety or performance issues unrelated to vehicle safety, because it requires the company

to consider the employee's safety record in connection with the type of infraction, frequency of the infraction, and results of the infraction. While Mills had previously been in several preventable vehicle accidents, the last one to have occurred was in August of 2004, more than five years prior. Mills' most recent employment review indicated his safety record was "satisfactory," and that Mills had complied with all company guidelines and policies regarding safety and training requirements.

Mills, however, was discharged based upon his "overall safety and performance record," and his "overall inability to perform [his] job safely and effectively," not just for the vehicle related infraction that occurred on November 23, 2009, or his vehicle related safety issues. In addition to vehicle accidents that occurred more than five years ago, Intermountain Gas relied upon several instances of disciplinary action related to record keeping and timekeeping that were more than three years old. The only recent disciplinary actions in Mills' personnel file of which Mills was aware were the August 2009 warning relating to performance and record keeping issues occurring over the course of one work day, and the November 2009 vehicle accident. Yet these two incidents and his discharge based upon his "overall" record, contrast with Mills' August 2009 performance review covering the previous year describing Mills as a competent, dependable, and consistent performer who satisfactorily met all safety policies and training requirements.

Under the above facts, the Court cannot say as a matter of law that Intermountain Gas gave Mills a "fair shake." Mills, a veteran employee, had been given opportunities in the past to adjust his performance. Arguably, based upon Mills record, he did so. His

August 2009 performance review was satisfactory, with no forewarning that there would be a "last straw," so to speak. And, not only are the two instances precipitating Mills' discharge unrelated in the sense that they reflect different policies—record keeping and documentation on the one hand contrasted with vehicle safety on the other—the ultimate decision to discharge Mills does not reflect a linear progression of discipline according to Intermountain Gas policy. Further, the vehicle accident precipitating the decision to discharge Mills, although a preventable accident due to negligence, was not severe and no similar vehicle accident had occurred for over five years. Accordingly, Mills should have the opportunity to persuade a jury that Intermountain Gas was incorrect in its assessment, considering the entirety of his employment record and the precipitating cause of Mills' discharge.

Despite a close call on the issue of just cause, Mills must demonstrate a material issue of disputed fact with respect to the handling of his grievance by the Union in order to successfully defend against both pending motions for summary judgment. Simply because a grievance might have merit does not in and of itself support a finding that the Union breached its duty of fair representation. *Vaca v. Snipes*, 386 U.S. 171, 192—193 (1967). Accordingly, the Court's finding that a disputed issue of material fact exists concerning Intermountain Gas's "just cause" to terminate Mills' employment is not determinative of Mills' Section 301 claim under the LMRA.[9]

---

[9] *See, e.g., Guzman v. Safeway Stores, Inc.*, 530 F.Supp.29, 34—35 (W.D. Tex. 1981) and *Watson v. Riverside Osteopathic Hospital*, 78 F.Supp.2d 634, 641—43 (E.D. Mich. 1999). In *Guzman*, the court determined upon summary judgment that the facts were disputed regarding the issue of just cause, but decided in favor of the union, and consequently the employer, on the employee's claim that the union breached its duty of fair representation. In *Watson*, the court found there were disputed issues of fact concerning whether the union breached its duty of fair

B . *Union's Duty of Fair Representation*

To establish a breach of a union's duty of fair representation, "an employee must show that the union's processing of the grievance was 'arbitrary, discriminatory, or in bad faith.'" *Slevira*, 200 F.3d at 1221, (quoting *Vaca v. Sipes*, 386 U.S. 171, 186 (1967)). A showing of mere negligence is insufficient to establish a breach of the duty. *Slevira*, 200 F.3d at 1221. Rather, a union must have acted in "reckless disregard" of the employee's rights. *Moore v. Bechtel Power Corp.*, 840 F.2d 634, 636 (9th Cir. 1988). Mills concedes that the Union's conduct does not support a showing that the Union acted discriminatorily or in bad faith, and therefore the only issue for the Court is whether the Union's conduct was arbitrary. (Mem. at 3, Dkt. 60.)

In determining whether a union's conduct is arbitrary, the Court applies a two-step analysis:

> First, we must decide whether the alleged union misconduct involved the union's judgment, or whether it was procedural or ministerial. Second, if the conduct was procedural or ministerial, then the plaintiff may prevail if the union's conduct was arbitrary, discriminatory, or in bad faith. However, if the conduct involved the union's judgment, then the plaintiff may prevail only if the union's conduct was discriminatory or in bad faith.

*Wellman v. Writers Guild of America, West, Inc.*, 146 F.3d 666, 670 (9th Cir. 1998) (citations omitted). Decisions whether, and in what manner, to pursue a particular grievance are matters of judgment for the union, and not the courts, to decide. *Patterson v. Internat'l B'hd of Teamsters, Local 959*, 121 F.3d 1345, 1349-50 (9th Cir. 1997), *cert. den.* 523 U.S. 1106 (1998); *see also Peterson v. Kennedy*, 771 F.2d 1244, 1254 (9th Cir.

---

representation, but decided summary judgment in favor of the employer and the union because it found no disputed issues of material fact concerning the employer's just cause to terminate the plaintiff's employment.

1985). "Unions are not liable for good faith, non-discriminatory errors of judgment made in the processing of grievances." *Peterson*, 771 F.2d at 1254; *see also Stevens v. Moore Business Forms, Inc.*, 18 F.3d 1443, 1448 (9th Cir. 1994).

The Ninth Circuit Court of Appeals in *Beck v. United Food and Commercial Workers Union, Local 99*, 506 F.3d 874, 879 (9th Cir. 2007), explained that there is a continuum of conduct, with ministerial acts on one end, and acts of judgment on the other. When a union's actions involve a ministerial act, actions or omissions that are "unintentional, irrational or wholly inexplicable, such as an irrational failure to perform a ministerial or procedural act," are arbitrary. *Beck*, 506 F.3d 880. Examples of such arbitrary conduct include a union's failure to research the CBA, failure to provide notice of meetings, tardy notification of a grievance decision, failure to timely file a grievance, and failure to notify an employee that her grievance would not be submitted to arbitration. *Beck*, 506 F.3d at 880 (citations omitted.)

Intentional conduct by a union exercising its judgment falls on the opposite end of the spectrum. *Beck*, 506 F.3d at 879. A union's conduct "constitutes an exercise of judgment entitled to deference even when the union's 'judgments are ultimately wrong.'" *Beck*, 506 F.3d at 879 (quoting *Marquez v. Screen Actors Guild, Inc.*, 525 U.S. 33, 45 – 46 (1998)). *Beck* noted that, under Supreme Court precedents, "so long as a union exercises its judgment, no matter how mistakenly, it will not be deemed to be wholly irrational." *Beck*, 506 F.3d 879. As an example, the United States Supreme Court in *Marquez* noted that a union's failure to negotiate the best agreement for its workers, when it ultimately proved to be a bad deal for the employees, was "insufficient to support

a holding that the union's conduct was arbitrary. A union's conduct can be classified as arbitrary only when it is irrational, when it is without a rational basis or explanation." *Marquez*, 525 U.S. at 46 (citations omitted.) It is only when the union's actions or inactions in the course of exercising its judgment are "so far outside a wide range of reasonableness that [they are] wholly irrational or arbitrary." *Beck*, 506 F. 3d at 879.

An employee must establish that the act caused substantial injury, which can occur if the union's arbitrary act or omission "completely extinguishes the employee's [grievance] right[s], . . . or where the union's arbitrary actions 'reflect reckless disregard for the rights of an individual employee,' or 'severely prejudice the injured employee' under circumstances that do not further the policies underlying the duty of fair representation." *Beck*, 506 F.3d at 880 (citations omitted.)

In this case, Mills' allegations that the Union violated the duty of fair representation concern the manner in which the Union represented him in grievance proceedings. Mills describes the Union's handling of his matter as "perfunctory," and a "sham." (Mem. at 9, Dkt. 60.)  A breach of duty on the part of the union may consist of "arbitrarily ignor[ing] a meritorious grievance or process[ing] it in a perfunctory fashion." *Lampkin v. Internat'l Union,* 154 F.3d 1136 1145 (10th Cir. 1998); *see also Tenorio v. Nat'l Labor Relations Board*, 680 F.2d 598, 601 (9th Cir. 1982) ("A union breaches its duty of fair representation if it processes a member's grievance in an arbitrary or perfunctory manner . . . [and] must conduct some minimal investigation of grievances brought to its attention.").

As a preliminary matter, Mills asserts the Union did not follow either step one or step two of the grievance procedure set forth in the CBA. (Pl.'s Mem. in Opp. at 4—5, Dkt. 60.) Article 35 of the CBA defines a grievance as a disagreement over the terms of the CBA. (Dkt. 46 at 28.) The CBA directs that all grievances that may arise "shall be settled in the simplest and most direct manner." Step one of the grievance procedure dictates that the formal grievance procedure will not be initiated during the first twenty-four hours after the grievance has occurred, but the grievance will be discussed between the aggrieved employee and the employee's immediate Supervisor within the next seventy two hours after the grievance has occurred. If the grievance is not settled within ninety-six hours, then the procedure continues to step two. Step two states that the grievance will be discussed between the aggrieved employee, the Union steward, and the appropriate manager. At step two, the grievance must be presented in writing and signed by the aggrieved within ninety-six hours after the answer was presented in the first step.

Clay was not informed of the potential grievance until December 3, 2009, after Mills had been placed upon suspension. The formal position of the company was not presented until the December 10, 2009 meeting, at which the termination letter was read. That meeting constitutes step one of the grievance procedure, considering until then, the company position was not fully known. The next day, on December 11, 2009, Clay met with Linda Murray and Mark Van Slyke of Intermountain Gas, as well as with Union representatives Robert Peterson, Tom Larson, and Scott Horton to discuss Mills' termination and inquire further about the company's position. At that point, the Union

began its investigation, led by Clay. The grievance procedure did not proceed to step two after the conclusion of Clay's investigation.

Arguably, the time limits of Section 35 were not followed considering the December 10, 2009 meeting occurred well after the December 3 notification by Mills to the Union that he had been placed upon suspension. The missed time limits might support Mills' claim that the Union acted arbitrarily. *Moore v. Bechtel Power Corp.*, 840 F.2d 634, 637 (9th Cir. 1988). However, Mills does not allege that the missed time limits prejudiced his grievance in any way, only that they were not followed, and Mills speculates that had the steps been followed, Mills might not have been discharged from employment. (Pl.'s Mem. in Opp. at 4—5, Dkt. 60.) Speculation that Mills might not have been discharged, however, does not equate to prejudice of any strong interest, considering the Union continued its investigation, met with Intermountain Gas representatives, and the failure to adhere strictly to the time lines did not extinguish any of Mills' rights. *See Galindo v. Stoody Co.*, 793 F.2d 1502, 1514 (9th Cir. 1986) (finding prejudice when a ministerial error resulted in extinguishment of the employee's seniority rights.)

Mills next asserts that the Union's arbitrary conduct generally falls into six areas, described as follows: 1) the Union's refusal to allow Mills to explain what occurred in relation to the reasons given for his termination and its assumption, without reason, that he had lied; 2) ignoring that Intermountain Gas did not have "just cause" to terminate Mills and had failed to abide by its own policies and procedures; 3) the Union's failure to stop Intermountain Gas from stacking the deck against Mills; 4) the Union's failure to

take any steps to protect Mills short of going through arbitration; 5) the Union's failure to perform a reasonable investigation into the charges; and 6) the Union's apparent policy of never filing grievances, even when meritorious. (Mem. at 5—6, Dkt. 60.)

The Union's actions and inaction about which Mills complains are matters of judgment within the Union's discretion. All six areas of contention take issue with how Clay conducted the investigation, and Clay's judgment concerning how to proceed or interpret the results of his investigation. None of Mills' allegations involve the Union's failure to perform a ministerial or procedural act. Mills must therefore establish that Clay's actions fall outside the range of reasonableness, so as to be arbitrary and irrational. The Court concludes that the undisputed material facts do not establish that the Union's conduct fell outside that range.

In *Moore v. Bechtel Power Corp.*, 840 F.2d 634, 637 (9th Cir. 1988), the Ninth Circuit Court of Appeals considered a similar laundry list of allegedly arbitrary and bad faith handling of a union member's grievances, including allegations that the Union "railroaded" the employee by consolidating his grievance with another employee's grievance, missed time limits at the step III level, and interpreted provisions of the CBA in favor of the company whenever possible. The court concluded that the allegations boiled down to the assertion that the Union "simply did not believe that appellants had a strong case." *Moore*, 840 F.2d at 637. The court held that a mere disagreement between a union and an employee over a grievance, standing alone, does not constitute evidence of bad faith, "even when the employee's grievance is meritorious." *Moore*, 840 F.2d at 637.

Similarly, Mills disagrees with Clay's handling of the investigation. Mills first contends Clay failed to obtain Mills' side of the story, and that their meeting on December 16 consisted of document review. However, Clay spoke to Mills on December 3, 2009, was present during the December 10, 2009, termination meeting, met again with Mills and his wife on December 16, 2009, and finally followed up with Mills on December 22, 2009. Mills was given multiple opportunities to explain what had occurred and assert his position. He apparently chose not to do so.[10] Clay ultimately concluded after the meetings with Mills that Mills was less than forthcoming about his disciplinary record. Specifically, Clay testified that "John Mills pretty much never told me about none of these, [verbal warnings] when he was asked more than once and never asked for a company representative—or a union representative to be at any of these meetings." (Clay Depo. at 91, Dkt. 62-2 at 18.)

Mills next contends that the Union failed to perform a reasonable investigation. Mills' arguments boil down to the assertion that Clay's investigation was not long enough or thorough enough. A union's investigation need only be more than minimal, and the thoroughness varies with the circumstances of each case. *Tenorio v. NLRB*, 680 F.2d 598, 602 (9th Cir. 1982). Mills relies upon *Tenorio*, wherein the plaintiffs contended the investigation was "so grossly inadequate as to transcend negligence and poor judgment." *Tenorio*, 680 F.2d at 601. In *Tenorio*, the court found the investigation

---

[10] Mills complains that the meeting on December 16 was primarily to allow Mills to review documents, and the conversation was focused on the new charges Intermountain Gas raised after Mills' termination as well as the August 21, 2009 write-up. (Pl.'s Mem. at 6, Dkt. 60.) Notably, Mills does not argue or present evidence that he was prevented from discussing his side of the story.

lacking because the union failed to talk to the employees at all. *Id.* at 602. The circumstances of this case, however, do not indicate the Union handled Mills' grievance arbitrarily and perfunctorily. Clay interviewed Mills. Clay had union representatives inquire about the vehicle accident history of other Intermountain Gas employees. Clay discussed with a long term employee what responsibilities Mills had and how he was required to perform his job. In light of these circumstances, the Court cannot conclude that the Union lacked an ample basis upon which to assess the merits of Mills' grievance.

The remaining three allegations, that the Union ignored that Intermountain Gas did not have "just cause" to terminate Mills, that the Union failed question why Intermountain Gas relied upon "stale" performance issues, and failed to advocate for Mills in terms of a suspension rather than a termination, all involve the Union's judgment. "Unions are not liable for good faith, non-discriminatory errors of judgment made in the processing of grievances." *Peterson*, 771 F.2d at 1254.

As the spokesperson for the Union, Clay provided a rational basis for the Union's decision not to pursue Mills' grievance. Specifically, Clay considered Mills' disciplinary record; the likelihood that discipline from prior years would be admissible in an arbitration proceeding and paint a picture of an employee with a history of progressive discipline who continued to violate company policy; Mills' failure to promptly respond to emergency calls; evidence that Mills was continuing to violate company safety policies relating to use of computers and cell phones; and Mills' credibility. (Aff. of Clay ¶ 24, Dkt. 47.) The Union's explanation for not proceeding to step two of the grievance procedure is based upon considered reasoning grounded in common sense principals, and

the Court will not question whether the reasoning was faulty, even in the face of Mills'

strong argument to the contrary. *Peters v. Burlington Northern R. Co.*, 931 F.2d 534, 540

(9th Cir. 1990);[11] *See also Conkle v. Jeong*, 73 F.3d 909 (9th Cir. 1995) (finding that the

union exercised its judgment by deciding not to file a written grievance upon receipt of

the employer's reasons for discharging the employee); *Evangelista v. Inlandboatmen's

Union of the Pacific MTG Enter., Inc.*, 777 F.2d 1390, 1395 (9th Cir. 1985) ("[T]he union

may reject unmeritorious grievances at the first step in the contractual procedure.");

*Newbanks v. Central Gulf Lines, Inc.*, 64 F.Supp.2d 1, 6 (D. Mass. 1999) (finding union

reached a rational, non-arbitrary decision when it balanced several factors, including the

facts of the case, likelihood of success, and impact of pursuit of the grievance upon other

union members, in reaching its decision).

Lastly, Mills objects on the grounds that the Union has never filed a grievance in

its long history with Intermountain Gas. The Court fails to see how this argument is

relevant to the Union's conduct in this case and its evaluation of Mills' grievance.

Moreover, union decisions are given substantial deference, considering the union must

balance the collective interests of its members and individual interests when it decides

how to pursue a grievance. *Dutrisac v. Caterpillar Tractor Co.*, 749 F.2d 1270, 1273 (9th

Cir. 1983).

---

[11] Specifically, the *Peters* court commented that "[i]f a union provides an explanation for having ignored a particularly strong argument during a grievance procedure that is based on reasoning, we will not question whether the reasoning was faulty or not. To do so would penalize the union for mere negligent decision making. But we must be able to determine whether the union deliberated the issue in the first place." Clay's affidavit, (Dkt. 47), his notes taken during the investigation, (Dkt. 62-9), and his deposition testimony (Dkt. 62-2 at 30—31), reflect that Clay considered a multitude of factors in deciding not to pursue a written grievance, and consciously deliberated the issues.

There is no genuine issue of material fact with respect to whether the Union breached its duty of fair representation. While Mills may dispute Clay's interpretation of the evidence, and the length and sufficiency of the investigation, there are no facts to support the charge that the Union treated Mills' grievance arbitrarily. The Union pursued Mills' grievance through step one of a three step procedure, and exercised its judgment not to pursue a written grievance at step two. Mills is therefore not entitled to proceed against Intermountain Gas.

## CONCLUSION

Accordingly, the Court will recommend dismissal of Mills' first and second causes of action, alleging breach of the collective bargaining agreement by Intermountain Gas and breach of the Union's duty of fair representation. Although the Court finds there are genuine issues of fact regarding Mills' claim for discharge in breach of the CBA, that claim is intertwined with the breach of fair representation claim. Because the fair representation claim does not survive summary judgment, both motions for partial summary judgment should be granted. *DelCostello*, 462 U.S. at 164-65. Mills' two additional claims for violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et. seq.* and the Idaho Wage Claim Act, Idaho Code §§ 45-601 *et. seq.* for unpaid regular and overtime wages remain.

## RECOMMENDATION

**NOW THEREFORE IT IS HEREBY RECOMMENDED:**

1) Motion for Summary Judgment of Defendant United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada Local 296 (Dkt. 42) be **GRANTED**.

2) Motion for Summary Judgment of Defendants Intermountain Gas Company and MDU Resources Group, Inc. (Dkt. 40) be **GRANTED**.

Written objections to this Report and Recommendation **must be filed on or before <u>March 7, 2012</u>**, and any response thereto **must be filed on or before <u>March 19, 2012</u>**, pursuant to 28 U.S.C. § 636(b)(1) and Dist. Idaho L. Rule 72.1(b), or as a result of failing to do so, that party may waive the right to raise factual and/or legal objections to the United States Court of Appeals for the Ninth Circuit.

Dated: **February 24, 2012**

Honorable Candy W. Dale
United States Magistrate Judge